**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| SHANDONG HI-SPEED BUILDING MATERIALS CO., LTD., as assignee of North American Wood, Inc. (d/b/a North American Metals LLC), | § § § § § | |
| Plaintiff | § § | |
| v. | § § | C.A. No. 4:25-cv-06215 |
| LIBERTY GENERAL INSURANCE BERHAD, | § § § § | |
| Defendant / Counterclaim-Plaintiff | § § § | |
| v. | § § | |
| SHANDONG HI-SPEED BUILDING MATERIALS CO., LTD., as assignee of North American Wood, Inc. (d/b/a North American Metals LLC), and NORTH AMERICA WOOD INC. (d/b/a North America Metals, Inc.), | § § § § § § § § § | |
| Counterclaim-Defendants | § | **ADMIRALTY** |

## ANSWER AND FIRST AMENDED COUNTERCLAIM

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES Defendant / Counterclaim-Plaintiff Liberty General Insurance Berhad, by and through its undersigned counsel, and, for its Answer and First Amended Counterclaim, would respectfully show as follows.

## I. ANSWER

Defendant Liberty General Insurance Berhad ("Liberty") answers the Amended Complaint (Doc. 34) of Plaintiff Shandong Hi-Speed Building Materials Co., Ltd. ("Shandong"), as assignee of North American Wood, Inc. (d/b/a North American Metals LLC) ("NAWI"), upon knowledge as to its own acts and upon information and belief as to all other matters, as follows:

1. Liberty denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 1 of the Amended Complaint.

2. Liberty denies the allegations in Paragraph 2 of the Amended Complaint.

3. Liberty denies the allegations in Paragraph 3 of the Amended Complaint, except admits that Liberty insured the goods described for the voyage and the sums insured stated in Certificate of Marine Cargo Insurance Nos. B2ME-080587, B2ME-080589, B2ME-080591, B2ME-080670, B2ME-080671, B2ME-080672, B2ME-080673, B2ME-080675, B2ME-080677, B2ME-080678, B2ME-080707 and B2ME-080708 (the "Certificates") subject to the terms and conditions of the Certificates and the terms and conditions of Marine Open Cover No. B2CC0000157 (the "Marine Insurance Policy") issued by Liberty.

4. Liberty denies the allegations in Paragraph 4 of the Amended Complaint.

5. Liberty denies the allegations in Paragraph 5 of the Amended Complaint.

6. Liberty denies the allegations in Paragraph 6 of the Amended Complaint, except admits that NAWI sent notice of loss to W.E. Cox Claims Group (USA) LLC on April 29, 2025 and that, over the course of several months and/or after repeated requests, NAWI provided claim and protest notice to the carrier, bills of lading, a survey report, photographs, laboratory analyses and contact details for some parties but did not provide all of the documents requested by W.E. Cox Claims Group PTE LTD ("W.E. Cox Singapore") in connection with W.E. Cox Singapore's investigation of the claim on behalf of Liberty.

7. Liberty denies the allegations in Paragraph 7 of the Amended Complaint.

8. Liberty denies that it is or has been engaging in delay and denies knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 8 of the Amended Complaint, except admits that Liberty did not accept any proposals made by NAWI.

9. Liberty denies that it has refused to indemnify NAWI or Shandong and that Liberty's conduct has enlarged the loss, and denies knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 9 of the Amended Complaint, except admits that Liberty has declined to pay the claim as presented by NAWI and Shandong.

10. Liberty denies the allegations in Paragraph 10 of the Amended Complaint on the ground, among others, that the allegations require Liberty to plead to a legal conclusion.

11. Liberty denies that it has engaged in wrongful conduct and denies knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 11 of the Amended Complaint.

12. Liberty denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 12 of the Amended Complaint.

13. Liberty denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 13 of the Amended Complaint, except admits that NAWI is a corporation organized and existing under the laws of the State of Wyoming and admits that Liberty insured the goods described for the voyage and the sums insured stated in the Certificates subject to the terms and conditions of the Certificates and the terms and conditions of the Marine Insurance Policy.

14.     Liberty denies that it is an "international insurance company" as pleaded and admits the remaining allegations in Paragraph 14 of the Amended Complaint.

15.     Liberty denies the allegations in Paragraph 15 of the Amended Complaint, except admits that Liberty Mutual Insurance Company is an insurance company organized and existing under the laws of the Commonwealth of Massachusetts with a principal place of business at 175 Berkeley Street, Boston, Massachusetts 02116.

16.     Liberty denies the allegations in Paragraph 16 of the Amended Complaint, except admits that W.E. Cox Singapore is the claims agent acting on behalf of Liberty in connection with the claim that is the subject of this action and that W.E. Cox Claims Group (USA) LLC, a separate company, has an office located at 2785 Route 115, Suite 201, Effort, Pennsylvania 18330.

17.     Liberty denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 17 of the Amended Complaint.

18.     Liberty denies the allegations in Paragraph 18 of the Amended Complaint on the ground, among others, that the allegations require Liberty to plead to a legal conclusion, except admits that the amount in controversy exceeds $75,000.

19.     Liberty denies the allegations in Paragraph 19 of the Amended Complaint on the ground, among others, that the allegations require Liberty to plead to a legal conclusion, except admits that this action involves a marine insurance policy.

20.     Liberty denies the allegations in Paragraph 20 of the Amended Complaint on the ground, among others, that the allegations require Liberty to plead to a legal conclusion.

21.     Liberty denies the allegations in Paragraph 21 of the Amended Complaint on the ground, among others, that the allegations require Liberty to plead to a legal conclusion.

22.    Liberty denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 22 of the Amended Complaint.

23.    Liberty denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 23 of the Amended Complaint.

24.    Liberty denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 24 of the Amended Complaint.

25.    Liberty denies the allegations in Paragraph 25 of the Amended Complaint, except admits that Liberty insured the goods described for the voyage and the sums insured stated in the Certificates subject to the terms and conditions of the Certificates and the terms and conditions of the Marine Insurance Policy and admits that the Institute Cargo Clauses (A) 1/1/09 ("ICC(A) Clauses") are one of the terms and conditions of the Certificates and of the Marine Insurance Policy.

26.    Liberty denies the allegations in Paragraph 26 of the Amended Complaint, except admits that the Insured Values stated in the Certificates total $5,278,882.50.

27.    Liberty denies the allegations in Paragraph 27 of the Amended Complaint.

28.    Liberty denies the allegations in Paragraph 28 of the Amended Complaint.

29.    Liberty denies the allegations in Paragraph 29 of the Amended Complaint, except denies knowledge or information sufficient to form a belief about the truth of the allegation in Paragraph 29 that NAWI was unaware of the unseaworthiness or unfitness of the vessel that carried the subject shipments and admits that the ICC(A) Clauses contain the language quoted in Paragraph 29 but denies any factual or legal inference intended by Shandong's selection of certain policy language and otherwise respectfully refers the Court to the Marine Insurance Policy, the Certificates and the ICC(A) Clauses in their entirety for the terms and conditions thereof.

30.     Liberty admits that the ICC(A) Clauses contain the language quoted in Paragraph 30 of the Amended Complaint but denies any factual or legal inference intended by Shandong's selection of certain policy language and otherwise respectfully refers the Court to the Marine Insurance Policy, the Certificates and the ICC(A) Clauses in their entirety for the terms and conditions thereof.

31.     Liberty denies the allegations in Paragraph 31 of the Amended Complaint, except admits that the ICC(A) Clauses contain the language quoted in Paragraph 31 but denies any factual or legal inference intended by Shandong's selection of certain policy language and otherwise respectfully refers the Court to the Marine Insurance Policy, the Certificates and the ICC(A) Clauses in their entirety for the terms and conditions thereof.

32.     Liberty denies the allegations in Paragraph 32 of the Amended Complaint, except admits that the ICC(A) Clauses contain a provision requiring the insured to take reasonable measures to avert or minimize losses and admits that the ICC(A) Clauses contain the language quoted in Paragraph 32 but denies any factual or legal inference intended by Shandong's selection of certain policy language and otherwise respectfully refers the Court to the Marine Insurance Policy, the Certificates and the ICC(A) Clauses in their entirety for the terms and conditions thereof.

33.     Liberty denies the allegations in Paragraph 33 of the Amended Complaint.

34.     Liberty denies the allegations in Paragraph 34 of the Amended Complaint, except admits that the ICC(A) Clauses state that the "insurance is subject to English law and practice," admits that the Certificates state that the "insurance is subject to English law" and admits that Section 13A of the UK Insurance Act of 2015 contains the language quoted in Paragraph 34 but denies any factual or legal inference intended by Shandong's selection of certain statutory

6

language and otherwise respectfully refers the Court to the UK Insurance Act of 2015 in its entirety for the provisions thereof.

35.    Liberty admits that Section 13A of the UK Insurance Act of 2015 contains the language quoted in Paragraph 35 of the Amended Complaint but denies any factual or legal inference intended by Shandong's selection of certain statutory language and otherwise respectfully refers the Court to the UK Insurance Act of 2015 in its entirety for the provisions thereof.

36.    Liberty denies the allegations in Paragraph 36 of the Amended Complaint, except admits that the gross premium paid to Liberty for the twelve shipments of steel carried on the M/V CHIPOLBROK SUN, Voyage 106, was RM 21,260.69.

37.    Liberty denies that only "superficial rust/atmospheric rust" was noted on the subject bills of lading and denies knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 37 of the Amended Complaint.

38.    Liberty denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 38 of the Amended Complaint.

39.    Liberty denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 39 of the Amended Complaint.

40.    Liberty denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 40 of the Amended Complaint.

41.    Liberty denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 41 of the Amended Complaint.

42.     Liberty denies the allegations in Paragraph 42 of the Amended Complaint, except admits that NAWI sent notice of loss to W.E. Cox Claims Group (USA) LLC on April 29, 2025 and that the notice of loss stated "there was severe rust damage, evidenced by traces of salt water."

43.     Liberty denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 43 of the Amended Complaint.

44.     Liberty denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 44 of the Amended Complaint.

45.     Liberty denies that the Sabine Surveyors, Ltd. Cargo Condition Survey Report dated May 16, 2025 states that approximately 82% of the steel was severely corroded and denies knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 45 of the Amended Complaint.

46.     Liberty denies the allegations in Paragraph 46 of the Amended Complaint, except admits that NAWI submitted the Sabine Cargo Condition Survey Report dated May 16, 2025 to W.E. Cox Singapore on May 19, 2025.

47.     Liberty denies the allegations in Paragraph 47 of the Amended Complaint, except admits that, over the course of several months and/or after repeated requests, NAWI provided to W.E. Cox Singapore (i) photographs of the cargoes reported to be at loading in Malaysia; (ii) photographs of the cargoes reported to be at discharge in Houston; (iii) bills of lading; (iv) the Sabine Cargo Condition Survey Report dated May 16, 2025 with analysis results and photographs; and (v) contact details for Chipolbrok, Gulfstream Marine, Sabine and Kaey Sea but did not provide all of the documents requested by W.E. Cox Singapore in connection with W.E. Cox Singapore's investigation of the claim on behalf of Liberty.

48. Liberty denies the allegations in Paragraph 48 of the Amended Complaint, except admits that NAWI submitted certain documents to W.E. Cox Singapore between April and October 2025.

49. Liberty denies the allegations in Paragraph 49 of the Amended Complaint.

50. Liberty denies the allegations in Paragraph 50 of the Amended Complaint.

51. Liberty denies the allegations in Paragraph 51 of the Amended Complaint, except admits that W.E. Cox Singapore first contacted Kaey Sea in Malaysia on August 7, 2025 after NAWI finally provided contact details for Kaey Sea on August 6, 2025 following repeated requests by W.E. Cox Singapore.

52. Liberty denies the allegations in Paragraph 52 of the Amended Complaint, except admits that NAWI's counsel provided certain documents to W.E. Cox Singapore on October 1, 2025 under cover of a letter demanding confirmation that Liberty would indemnify NAWI by October 8, 2025 and admits that Liberty has not confirmed coverage for the claim that is the subject of this action.

53. Liberty denies the allegations in Paragraph 53 of the Amended Complaint.

54. Liberty denies that it is or has been engaging in delay, denies that Liberty is liable as alleged, and denies knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 54 of the Amended Complaint.

55. Liberty denies the allegations in Paragraph 55 of the Amended Complaint, except admits that NAWI offered to retain the cargoes "as-is/where-is" for $2,064,500 in exchange for Liberty reimbursing already-incurred storage and handling costs and paying the balance of the insured value.

56.     Liberty denies that its conduct has enlarged the loss and denies knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 56 of the Amended Complaint.

57.     Liberty denies the allegations in Paragraph 57 of the Amended Complaint, except admits that NAWI provided notice of claim, certain claim supports and contact information for some parties, admits that Liberty did not accept any proposals made by NAWI and admits that Liberty has not paid the claim that is the subject of this action.

58.     Liberty denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 58 of the Amended Complaint.

59.     Liberty admits that Exhibit 1 to the Amended Complaint contains the language quoted in Paragraph 59 of the Amended Complaint but denies any factual or legal inference intended by Shandong's selection of certain language and otherwise respectfully refers the Court to Exhibit 1 in its entirety for the provisions thereof.

60.     Liberty denies the allegations in Paragraph 60 of the Amended Complaint, except admits that the Amended Complaint seeks to recover alleged damages, expenses and losses for alleged breach of contract and alleged late payment under Section 13A of the UK Insurance Act of 2015.

**AS AND TO THE FIRST CAUSE OF ACTION**
**(Breach of Contract)**

61.     Liberty repeats and realleges each and every response set forth in Paragraphs 1 through 60 of this Answer with the same force and effect as if more fully set forth herein.

62.     Liberty denies the allegations in Paragraph 62 of the Amended Complaint, except admits that Liberty insured the goods described for the voyage and the sums insured stated in the Certificates subject to the terms and conditions of the Certificates and the terms and conditions of

the Marine Insurance Policy and admits that the gross premium paid to Liberty for the twelve shipments of steel from Port Klang, Malaysia to Houston, Texas was RM 21,260.69.

63.     Liberty denies the allegations in Paragraph 63 of the Amended Complaint.

64.     Liberty denies the allegations in Paragraph 64 of the Amended Complaint.

65.     Liberty denies the allegations in Paragraph 65 of the Amended Complaint, except admits that NAWI sent notice of loss to W.E. Cox Claims Group (USA) LLC on April 29, 2025, admits that NAWI provided Sabine's Cargo Condition Survey Report dated May 16, 2025 to W.E. Cox Singapore on May 19, 2025 and admits that, over the course of several months and/or after repeated requests, NAWI provided certain documents in support of its claim but did not provide all of the documents requested by W.E. Cox Singapore in connection with W.E. Cox Singapore's investigation of the claim on behalf of Liberty.

66.     Liberty denies the allegations in Paragraph 66 of the Amended Complaint.

67.     Liberty denies the allegations in Paragraph 67 of the Amended Complaint.

68.     Liberty denies the allegations in Paragraph 68 of the Amended Complaint.

69.     Liberty denies the allegations in Paragraph 69 of the Amended Complaint, except admits that Liberty did not accept any proposals made by NAWI.

70.     Liberty denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 70 of the Amended Complaint.

71.     Liberty denies the allegations in Paragraph 71 of the Amended Complaint.

72.     Liberty denies the allegations in Paragraph 72 of the Amended Complaint.

**AS AND TO THE SECOND CAUSE OF ACTION**
**(Violation of Section 13A of the UK Insurance Act of 2015)**

73.     Liberty repeats and realleges each and every response set forth in Paragraphs 1 through 60 of this Answer with the same force and effect as if more fully set forth herein.

11

74.     Liberty denies the allegations in Paragraph 74 of the Amended Complaint, except admits that the ICC(A) Clauses state that the "insurance is subject to English law and practice," admits that the Certificates state that the "insurance is subject to English law" and admits that Section 13A of the UK Insurance Act of 2015 contains the language quoted in Paragraph 74 but denies any factual or legal inference intended by Shandong's selection of certain statutory language and otherwise respectfully refers the Court to the UK Insurance Act of 2015 in its entirety for the provisions thereof.

75.     Liberty denies the allegations in Paragraph 75 of the Amended Complaint, except admits that NAWI sent notice of loss to W.E. Cox Claims Group (USA) LLC on April 29, 2025, admits that NAWI provided Sabine's Cargo Condition Survey Report dated May 16, 2025 to W.E. Cox Singapore on May 19, 2025 and admits that, over the course of several months and/or after repeated requests, NAWI provided certain documents in support of its claim but did not provide all of the documents requested by W.E. Cox Singapore in connection with W.E. Cox Singapore's investigation of the claim on behalf of Liberty.

76.     Liberty denies the allegations in Paragraph 76 of the Amended Complaint.

77.     Liberty denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 77 of the Amended Complaint.

78.     Liberty denies the allegations in Paragraph 78 of the Amended Complaint.

79.     Liberty denies the allegations in Paragraph 79 of the Amended Complaint.

80.     Liberty denies the allegations in Paragraph 80 of the Amended Complaint.

### AS AND TO THE THIRD CAUSE OF ACTION
**(Declaratory Judgment)**

81.     Liberty repeats and realleges each and every response set forth in Paragraphs 1 through 60 of this Answer with the same force and effect as if more fully set forth herein.

82.     Liberty denies the allegations in Paragraph 82 of the Amended Complaint on the ground, among others, that the allegations require Liberty to plead to a legal conclusion, except admits that an actual and justiciable controversy exists between Shandong and Liberty regarding Liberty's obligations under the Marine Insurance Policy and the Certificates.

83.     Liberty denies the allegations in Paragraph 83 of the Amended Complaint, except admits that Liberty disputes that it is obligated, pursuant to the Marine Insurance Policy, the Certificates and applicable law, to indemnify Shandong for the alleged damage suffered by the steel cargoes and to reimburse Shandong for storage, handling, sue and labor expenses, and other related costs.

84.     Liberty admits the allegations in Paragraph 84 of the Amended Complaint.

85.     Liberty denies knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 85 of the Amended Complaint.

86.     Liberty denies the allegations in Paragraph 86 of the Amended Complaint on the ground, among others, that the allegations require Liberty to plead to a legal conclusion.

## RESPONSE TO JURY DEMAND

87.     Liberty denies that Shandong is entitled to a trial by jury on any issue.

## RESPONSE TO PRAYER FOR RELIEF

Liberty denies that Shandong is entitled to the relief set forth in the Prayer for Relief stated in the Amended Complaint.

## DEFENSES AND AFFIRMATIVE DEFENSES

For its further and separate defenses and affirmative defenses to the Amended Complaint, Liberty avers, upon knowledge as to its own acts and upon information and belief as to all other matters, as follows:

## FIRST DEFENSE/AFFIRMATIVE DEFENSE

88.     Liberty is not subject to general jurisdiction in this Court. It is a foreign business entity formed and organized under the laws of Malaysia with a principal place of business in Malaysia.

89.     Liberty is not subject to specific jurisdiction in this Court. Shandong cannot show that Liberty has sufficient minimum contacts with Texas (*i.e.*, that Liberty purposefully availed itself of conducting activities within the forum state), that the claims against Liberty arise out of or relate to Liberty's contacts with Texas, or that exercising jurisdiction over Liberty is consistent with traditional notions of fair play and substantial justice. The single transaction alleged in the Amended Complaint of Liberty's insuring shipments destined for discharge from a vessel in Texas is insufficient to subject Liberty to specific jurisdiction on the causes of action alleged in the Amended Complaint. This is particularly true as no acts relating to the formation of the insurance contract or the alleged subsequent breach thereof occurred in Texas, the insurance contract did not require performance by Liberty in Texas, and the insurance contract is centered outside of Texas.

90.     The Court lacks personal jurisdiction over Liberty. The Amended Complaint should be dismissed pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.

## SECOND DEFENSE/AFFIRMATIVE DEFENSE

91.     This District is an improper venue for the claims alleged in the Amended Complaint. The Amended Complaint should be dismissed pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure.

### **THIRD DEFENSE/AFFIRMATIVE DEFENSE**

92.     Service of process on Liberty was insufficient and did not comply with Rule 4 of the Federal Rules of Civil Procedure. The Amended Complaint should be dismissed pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure.

### **FOURTH DEFENSE/AFFIRMATIVE DEFENSE**

93.     The Amended Complaint fails to state a claim upon which relief can be granted and should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

94.     In particular, but not exclusively, the Third Cause of Action for declaratory judgment is duplicative of the First Cause of Action for breach of contract. The claim for declaratory judgment will not clarify any uncertainty in the parties' legal relations that would otherwise remain unresolved as part of the breach of contract claim and, therefore, declaratory judgment would serve no useful purpose. The Third Cause of Action should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### **FIFTH DEFENSE/AFFIRMATIVE DEFENSE**

95.     Shandong is not the real party in interest under Rule 17(a)(1) of the Federal Rules of Civil Procedure.

96.     The Amended Complaint alleges that NAWI assigned to Shandong all rights, title and interest in the claims asserted in the action and all rights to recover under the Marine Insurance Policy.

97.     Shandong's original counsel notified Liberty and W.E. Cox Singapore of the purported assignment on February 12, 2026. In its cover letter, Shandong's counsel asserted that NAWI filed the action "in its own name against Liberty with the sole purpose of stealing and converting the funds Liberty is to pay [for the claim]." The attorneys demanded that Liberty pay

the insurance proceeds to Shandong. NAWI's counsel responded later on February 12, 2026 that they had "reason to believe the [Assignment] ... may not be authentic" and that they were "investigating whether these documents are forgeries." NAWI's counsel "object[ed] to Liberty [ ] making any payments or taking any actions in response to [the letter from Shandong's counsel]." Shandong's counsel replied still later on February 12, 2026 that Shandong "maintain[ed] those are not forgeries and if we are indeed correct, then [NAWI] has attempted to defraud both the carrier and the court."

98. To date, the authenticity of the assignment has not been established. While a declaration was submitted by Shandong in support of its entry into this action, no declaration by NAWI was filed acknowledging the assignment or attesting to its legitimacy.

99. Liberty does not concede the genuineness, validity or enforceability of the asserted assignment.

100. Shandong must establish that there is a valid assignment under English law, whether by way of a legal assignment pursuant to Section 50 of the Marine Insurance Act 1906 or, alternatively, by way of an equitable assignment.

101. It further remains for Shandong to prove that it is entitled to claim and to recover under the Marine Insurance Policy and/or the Certificates.

## SIXTH DEFENSE/AFFIRMATIVE DEFENSE

102. In the event it is no longer a party to this action, NAWI is a required party under Rule 19(a) of the Federal Rules of Civil Procedure and must be joined as a party.

103. A valid legal assignment has been not effected by NAWI to Shandong.

104. Liberty does not concede the genuineness, validity or enforceability of the asserted assignment.

105.    Assuming, *arguendo*, that only an equitable assignment has been effected by NAWI to Shandong, Shandong is not entitled to be the sole claimant and NAWI must be joined as a party to the action.

106.    If NAWI cannot be joined, then this action should not, in equity and good conscience, proceed among the existing parties and should be dismissed pursuant to Rule 19(b).

## SEVENTH DEFENSE/AFFIRMATIVE DEFENSE

107.    If Shandong is the assignee of NAWI as alleged in the Amended Complaint, Shandong's claims are subject to the same defenses and exceptions to Liberty's liability under the Marine Insurance Policy, the Certificates and/or otherwise that NAWI's claims would be.

108.    If Shandong can establish a prima facie case showing that the loss alleged in the Amended Complaint falls within the insuring terms of the Marine Insurance Policy and/or the Certificates and coverage for such loss is not excluded or excepted thereunder, Liberty is entitled to rely on Section 50(2) of the Marine Insurance Act 1906. This entitles Liberty to rely on the same defenses against Shandong as would have been available against NAWI.

## EIGHTH DEFENSE/AFFIRMATIVE DEFENSE

109.    Liberty has acted diligently and reasonably in handling the claim.

110.    Liberty denies that it has failed to pay the claim within a reasonable time.

111.    If Shandong can show that Liberty has failed to pay the claim within a reasonable time, Liberty has reasonable grounds to dispute the claim.

112.    These grounds include, but are not limited to, disputing whether coverage exists, the extent of the loss and the quantum of the loss.

113.    These grounds also include the filing of this action by NAWI on December 22, 2025 after NAWI purportedly assigned and transferred all rights, title and interest in the claims at

17

issue, including any claims against Liberty, to Shandong on November 7, 2025. Shandong's original counsel notified Liberty and W.E. Cox Singapore of the purported assignment on February 12, 2026. In its cover letter, Shandong's counsel asserted that NAWI filed the action "in its own name against Liberty with the sole purpose of stealing and converting the funds Liberty is to pay [for the claim]." The attorneys demanded that Liberty pay the insurance proceeds to Shandong. NAWI's counsel responded later on February 12, 2026 that they had "reason to believe the [Assignment] ... may not be authentic" and that they were "investigating whether these documents are forgeries." NAWI's counsel "object[ed] to Liberty [ ] making any payments or taking any actions in response to [the letter from Shandong's counsel]." Shandong's counsel replied still later on February 12, 2026 that Shandong "maintain[ed] those are not forgeries and if we are indeed correct, then [NAWI] has attempted to defraud both the carrier and the court." To date, the authenticity of the assignment has not been established. While a declaration was submitted by Shandong in support of its entry into this action, no declaration by NAWI was filed acknowledging the assignment or attesting to its legitimacy. Liberty does not concede the genuineness, validity or enforceability of the asserted assignment. It remains for Shandong to prove that it is entitled to claim and to recover under the Marine Insurance Policy and/or the Certificates. Without prejudice to the foregoing, if a valid assignment has been executed, and on the basis that Exhibit 1 to the Amended Complaint provides that the assignment relates only to the claim (and not to the Marine Insurance Policy and/or the Certificates), Shandong in any event has no valid claim under Section 13A of the Insurance Act of 2015. Shandong is not a party to the insurance contract and does not have a remedy under Section 13A in its alleged capacity as an assignee of the claim only.

114. There is no breach of Section 13A of the UK Insurance Act of 2015. There has been no delay, but in any event, the investigation, assessment and adjustment of the claim have been prevented and/or adversely affected by NAWI's and Shandong's failures to:

    (a)    customs clear the goods to facilitate any salvage sale;

    (b)    act as a prudent uninsured and take reasonable steps to mitigate the loss;

    (c)    sort and segregate the cargoes to enable determination of the extent of damage and proper assessment/adjustment of the claim; and/or

    (d)    provide satisfactory documentation.

**NINTH DEFENSE/AFFIRMATIVE DEFENSE**

115. Clause 1 of the ICC(A) Clauses states: "This insurance covers all risks of loss of or damage to the subject-matter insured except as excluded by the provisions of Clauses 4, 5, 6 and 7 below."

116. All-risks policies are not "all loss" policies. Labeling the policy as "all-risks" does not relieve the insured of its initial burden of demonstrating a covered loss under the terms and conditions of the policy.

117. To state a prima facie case for recovery under an all-risks policy, the insured must demonstrate: (a) the existence of an all-risks policy; (b) an insurable interest in the subject of the insurance contract; and (c) the fortuitous loss of the covered property during the period of coverage.

118. A prima facie showing has not been made that the loss alleged in the Amended Complaint falls, in whole or in part, within the insuring terms of the Marine Insurance Policy and/or the Certificates.

19

119.    Among other things, it has not been shown that the steel was in good order and condition at the time of attachment of cover under the Marine Insurance Policy and/or the Certificates – particularly in light of the reported pre-loading condition of the steel, the claused bill of lading for each of the twelve shipments and the lack of pre-loading documentation/evidence.

120.    Among other things, it has not been shown that the alleged loss was fortuitous rather than caused by or a result of a pre-shipment condition and/or inherent vice.

121.    Among other things, it has not been shown that the alleged loss occurred during the period of coverage.

122.    Clause 8 of the ICC(A) Clauses states, in relevant part:

**DURATION**
Transit Clause
**8.**    8.1 Subject to Clause 11 below, this insurance attaches from the time the subject-matter insured is first moved in the warehouse or at the place of storage (at the place named in the contract of insurance) for the purpose of the immediate loading into or onto the carrying vehicle or other conveyance for the commencement of transit,

continues during the ordinary course of transit

and terminates either

8.1.1    on completion of unloading from the carrying vehicle or other conveyance in or at the final warehouse or place of storage at the destination named in the contract of insurance,

8.1.2    on completion of unloading from the carrying vehicle or other conveyance in or at any other warehouse or place of storage, whether prior to or at the destination named in the contract of insurance, which the Assured or their employees elect to use either for storage other than in the ordinary course of transit or for allocation or distribution, or

8.1.3    when the Assured or their employees elect to use any carrying vehicle or other conveyance or any container for storage other than in the ordinary course of transit or

8.1.4    on the expiry of 60 days after completion of discharge overside of the subject-matter insured from the oversea vessel at the final port of discharge,

whichever shall first occur.

123.    Rust was observed on the steel prior to the shipments being loaded onto the carrying vessel, which would have been before coverage attached under the Marine Insurance Policy and/or the Certificates.

124.    Shandong alleges that the steel was contaminated from both seawater and freshwater. The steel was stored in the open in Malaysia prior to loading on the carrying vessel. The steel, in whole or in part, was stored in the open at the Port of Houston following discharge from the carrying vessel and exposed to the elements, including multiple rain showers. Freshwater contamination that occurred prior to loading on the carrying vessel would have been before coverage attached under the Marine Insurance Policy and/or the Certificates. Likewise, freshwater contamination that occurred after discharge from the carrying vessel would have been after coverage terminated under the Marine Insurance Policy and/or the Certificates. According to Paragraph B of the Recitals in Exhibit 1 to the Amended Complaint, the steel was first shipped from China. The Marine Insurance Policy and/or the Certificates do not cover losses arising out of transit between China and Malaysia occurring prior to the steel being loaded on board the carrying vessel.

125.    Unless and until Shandong discharges its prima facie burden, Liberty is under no obligation to demonstrate that any exclusion or exception to coverage applies. However, Liberty reserves its rights to rely upon policy exclusions and exceptions in the event that Shandong satisfies its prima facie burden.

21

## TENTH DEFENSE/AFFIRMATIVE DEFENSE

126.    Clause 11 of the ICC(A) Clauses states:

CLAIMS
Insurable Interest
11.    11.1    In order to recover under this insurance the Assured must have an insurable interest in the subject matter insured at the time of the loss.
         11.2    Subject to Clause 11.1 above, the Assured shall be entitled to recover for insured loss occurring during the period covered by this insurance, notwithstanding that the loss occurred before the contract of insurance was concluded, unless the Assured were aware of the loss and the Insurers were not

127.    Given that the claused bill of lading for each of the twelve shipments predates the corresponding Certificates, NAWI had prior knowledge of cargo damage before the insurance contract was concluded and the attachment of cover. Pursuant to Clause 11.2, Shandong is not entitled to claim for such pre-existing damage.

## ELEVENTH DEFENSE/AFFIRMATIVE DEFENSE

128.    The Marine Insurance Policy includes a provision that states:

**Buyer's Contingent Interest**
This insurance covers damage to or loss of the goods and also expenses incurred in so far such damage, loss or expense is recoverable according to the cargo insurance conditions agreed by the Assured and the Insurer, resulting from, that the seller has omitted to acquire cargo insurance, contrary to his obligations in this respect according to the terms of delivery of the contract of sale; that the insurer of the insurance acquired by the seller according to the terms of delivery, does not adjust or rejects a claim for damage, loss or expense, payable under the cargo insurance; that the insurance acquired by the seller either provides a less extensive cover than the insurance cover agreed between the Assured and the Insurer (Difference in Conditions) or that the insured amount is lower than invoice value

To the extent that damage, loss or expense is recoverable under the insurance acquired by the seller, this insurance is subsidiary to such insurance.

When a claim is made under this insurance, the Assured must prove that damage, loss or expense has been incurred and, where appropriate, prove that reasonable measures have been taken to obtain compensation from the seller and/or other parties concerned.

If compensation is paid by the Insurer in accordance with this insurance, the insurer shall, where appropriate, be subrogated to the Assured's rights against the seller and/or other parties concerned. The Assured shall upon request by the Insurer, in his own name but on behalf of the Insurer and at his expense, pursue the Insurer's claim against the seller and/or other parties concerned.

The Assured must not divulge this insurance to the seller or other parties. If the Assured fails in this respect the compensation may be reduced or not paid at all. This insurance is to the benefit of the Assured and/or declared Creditors interests and must not be transferred to other parties.

This insurance is subject to the cargo insurance conditions agreed to between the Assured and the Insurer.

129.    NAWI purchased each of the twelve shipments from sellers in Malaysia.

130.    The terms of sale for each of the twelve shipments were "CIF Houston, TX."

131.    Pursuant to the Buyer's Contingent Interest clause, Shandong must first seek indemnity under the sellers' CIF policy(ies) and bears the burden of demonstrating that it is not seeking a double recovery.

132.    In addition or in the alternative to the foregoing, if the Marine Insurance Policy and/or the Certificates and one or more other policies of insurance cover the same interest, then any recoverable claim should be apportioned rateably between the insurers of each policy.

### TWELFTH DEFENSE/AFFIRMATIVE DEFENSE

133.    Clause 1 of the ICC(A) Clauses states: "This insurance covers all risks of loss of or damage to the subject-matter insured except as excluded by the provisions of Clauses 4, 5, 6 and 7 below."

23

134. Clause 4 of the ICC(A) Clauses states, in relevant part:

**EXCLUSIONS**
**4.**    In no case shall this insurance cover

* * *

4.4    loss damage or expense caused by inherent vice or nature of the subject-matter insured

135. Among other things, rust formation resulting from atmospheric conditions and/or freshwater wetting is an inherent vice of the type of steel that was in the shipments.

136. If Shandong can make a prima facie showing that the loss alleged in the Amended Complaint falls within the insuring terms of the Marine Insurance Policy and/or the Certificates, such loss is excluded by the above provision in the ICC(A) Clauses.

## THIRTEENTH DEFENSE/AFFIRMATIVE DEFENSE

137. The Marine Insurance Policy includes a provision that states, in relevant part:

Exclusions and Warranties (Where Applicable)
------------------------------------------------------------
    *    Excluding Rusting, Oxidation and Discolouring Unless Caused By Insured Perils

138. If Shandong can make a prima facie showing that the loss alleged in the Amended Complaint falls within the insuring terms of the Marine Insurance Policy and/or the Certificates, such loss is excluded by the above provision in the Marine Insurance Policy.

## FOURTEENTH DEFENSE/AFFIRMATIVE DEFENSE

139. Clause 1 of the ICC(A) Clauses states: "This insurance covers all risks of loss of or damage to the subject-matter insured except as excluded by the provisions of Clauses 4, 5, 6 and 7 below."

24

140.    Clause 4 of the ICC(A) Clauses states, in relevant part:

**EXCLUSIONS**
**4.**    In no case shall this insurance cover
    4.1    loss damage or expense attributable to wilful misconduct of the Assured

141.    Wilful misconduct does not require intent to cause loss/damage; reckless indifference is sufficient if the insured is aware, at the material time, that loss/damage is likely to result.

142.    NAWI's and/or Shandong's conduct, by refusing to take delivery of the shipments, leaving cargo exposed inside and outside a warehouse, refusing to mitigate the loss, and failing to pay import duty and customs to clear the goods, amounts to wilful misconduct, particularly as these failures directly or indirectly caused, contributed to or aggravated the damage complained of and/or gave rise to the claimed handling and storage charges.

143.    If Shandong can make a prima facie showing that the loss alleged in the Amended Complaint falls within the insuring terms of the Marine Insurance Policy and/or the Certificates, such loss is excluded by the above provision in the ICC(A) Clauses.

## FIFTEENTH DEFENSE/AFFIRMATIVE DEFENSE

144.    Clause 1 of the ICC(A) Clauses states: "This insurance covers all risks of loss of or damage to the subject-matter insured except as excluded by the provisions of Clauses 4, 5, 6 and 7 below."

145. Clause 4 of the ICC(A) Clauses states, in relevant part:

**EXCLUSIONS**
**4.** In no case shall this insurance cover

* * *

4.5 loss damage or expense caused by delay, even though the delay be caused by a risk insured against (except expenses payable under Clause 2 above)

146. Under the reported terms of sale with its suppliers, NAWI was responsible to pay the customs duty and other fees required to have the shipments that are the subject of this action released by U.S. Customs and Border Protection and removed from the Port of Houston.

147. The shipments were reportedly put on a Customs hold for general order following discharge at the Port of Houston because the shipments did not clear Customs in a timely manner.

148. It is also reported that NAWI and/or Shandong did not pay the required Customs duty needed to remove the shipments from the Port of Houston.

149. NAWI and/or Shandong failed to obtain the prompt release of the shipments from the Port of Houston, thereby exposing the steel to the elements, including multiple rain showers, causing, contributing to or aggravating the damage complained of.

150. In addition, NAWI and/or Shandong kept the shipments at the Port of Houston for an unreasonable period of time and thereby exposed the steel to the elements, including multiple rain showers, causing, contributing to or aggravating the damage complained of and/or unreasonably incurring certain charges, expenses and costs to handle and store the shipments at the port.

151. If Shandong can make a prima facie showing that the loss alleged in the Amended Complaint falls within the insuring terms of the Marine Insurance Policy and/or the Certificates, such loss is excluded by the above provision in the ICC(A) Clauses.

## SIXTEENTH DEFENSE/AFFIRMATIVE DEFENSE

152. Clause 1 of the ICC(A) Clauses states: "This insurance covers all risks of loss of or damage to the subject-matter insured except as excluded by the provisions of Clauses 4, 5, 6 and 7 below."

153. Clause 5 of the ICC(A) Clauses states, in relevant part:

**EXCLUSIONS**

\* \* \*

**5.**    5.1    In no case shall this insurance cover loss damage or expense arising from

        5.1.1    unseaworthiness of vessel or craft or unfitness of vessel or craft for the safe carriage of the subject-matter insured, where the Assured are privy to such unseaworthiness or unfitness, at the time the subject-matter insured is loaded therein

154. If Shandong can make a prima facie showing that the loss alleged in the Amended Complaint falls within the insuring terms of the Marine Insurance Policy and/or the Certificates, such loss is excluded by the above provision in the ICC(A) Clauses.

## SEVENTEENTH DEFENSE/AFFIRMATIVE DEFENSE

155. Clause 1 of the ICC(A) Clauses states: "This insurance covers all risks of loss of or damage to the subject-matter insured except as excluded by the provisions of Clauses 4, 5, 6 and 7 below."

156. Clause 6 of the ICC(A) Clause states, in relevant part:

**EXCLUSIONS**

\* \* \*

**6.**    In no case shall this insurance cover loss damage or expense caused by

\* \* \*

27

6.2   capture seizure arrest restraint or detainment (piracy excepted), and the consequences thereof or any attempt thereat.

157.   Under the reported terms of sale with its suppliers, NAWI was responsible to pay the customs duty and other fees required to have the shipments that are the subject of this action released by U.S. Customs and Border Protection and removed from the Port of Houston.

158.   The shipments were reportedly put on a Customs hold for general order following discharge at the Port of Houston because the shipments did not clear Customs in a timely manner.

159.   It is also reported that NAWI and/or Shandong did not pay the required Customs duty needed to remove the shipments from the Port of Houston.

160.   The Customs hold at the Port of Houston exposed the steel to the elements, including multiple rain showers, causing, contributing to or aggravating the damage complained of.

161.   If Shandong can make a prima facie showing that the loss alleged in the Amended Complaint falls within the insuring terms of the Marine Insurance Policy and/or the Certificates, such loss is excluded by the above provision in the ICC(A) Clauses.

## EIGHTEENTH DEFENSE/AFFIRMATIVE DEFENSE

162.   Clause 18 of the ICC(A) Clauses states:

**AVOIDANCE OF DELAY**
**18.** It is a condition of this insurance that the Assured shall act with reasonable despatch in all circumstances within their control

163.   The Certificates likewise state: "It is a condition of this Insurance that the Assured shall act with reasonable dispatch in all circumstances within their control."

164.   If Shandong can make a prima facie showing that the loss alleged in the Amended Complaint falls within the insuring terms of the Marine Insurance Policy and/or the Certificates

28

and coverage for such loss is not excluded or excepted thereunder, such coverage has been forfeited by NAWI's and/or Shandong's failing to act with reasonable dispatch in all circumstances within its control.

165.    Under the reported terms of sale with its suppliers, NAWI was responsible to pay the customs duty and other fees required to have the shipments that are the subject of this action released by U.S. Customs and Border Protection and removed from the Port of Houston.

166.    The shipments were reportedly put on a Customs hold for general order following discharge at the Port of Houston because the shipments did not clear Customs in a timely manner.

167.    It is also reported that NAWI and/or Shandong did not pay the required Customs duty needed to remove the shipments from the Port of Houston.

168.    NAWI and/or Shandong failed to obtain the prompt release of the shipments from the Port of Houston and thereby exposed the steel to the elements, including multiple rain showers, causing, contributing to or aggravating the damage complained of.

169.    In addition, NAWI and/or Shandong kept the shipments at the Port of Houston for an unreasonable period of time and thereby exposed the steel to the elements, including multiple rain showers, causing, contributing to or aggravating the damage complained of and/or unreasonably incurring certain charges, expenses and costs to handle and store the shipments at the port.

### NINETEENTH DEFENSE/AFFIRMATIVE DEFENSE

170.    Clause 16 of the ICC(A) Clauses states:

**MINIMISING LOSSES**
Duty of Assured

**16.**    It is the duty of the Assured and their employees and agents in respect of
loss recoverable hereunder

29

16.1   to take such measures as may be reasonable for the purpose of averting or minimising such loss, and

16.2   to ensure that all rights against carriers, bailees or other third parties are properly preserved and exercised

the Insurers will, in addition to any loss recoverable hereunder, reimburse the Assured for any charges properly and reasonably incurred in pursuance of these duties.

171. The purpose of this provision is to benefit the insurer by reducing the amount of loss it would have to pay.

172. Liberty disputes that the loss alleged in the Amended Complaint is recoverable under the Marine Insurance Policy and/or the Certificates.

173. If Shandong can make a prima facie showing that the loss alleged in the Amended Complaint falls within the insuring terms of the Marine Insurance Policy and/or the Certificates and coverage for such loss is not excluded or excepted thereunder, NAWI and/or Shandong breached their duty under Clause 16 by failing to take such measures as were reasonable for the purpose of averting or minimizing the loss and/or by failing to ensure that all rights against carriers, bailees or other third parties have been properly preserved and exercised.

174. Among other things, NAWI and/or Shandong have failed to act as a prudent uninsured.

175. Among other things, NAWI and/or Shandong failed to obtain the prompt release of the shipments from the Port of Houston and thereby exposed the steel to the elements, including multiple rain showers, causing, contributing to or aggravating the damage complained of.

176. Among other things, NAWI and/or Shandong kept the shipments at the Port of Houston for an unreasonable period of time and thereby exposed the steel to the elements, including multiple rain showers, causing, contributing to or aggravating the damage complained

of and/or unreasonably incurring certain charges, expenses and costs to handle and store the shipments at the port.

177. Among other things, NAWI and/or Shandong have failed to separate the damaged portion of the insured goods from the sound portion of such goods.

178. Among other things, NAWI and/or Shandong have refused to accept undamaged goods and/or goods that could be used for their intended purpose.

179. Among other things, NAWI and/or Shandong have failed to take any steps to remediate the alleged damage.

180. Among other things, NAWI and/or Shandong have failed to reduce the loss by means of a salvage sale.

181. Among other things, NAWI improperly sought to declare a constructive total loss and to abandon the goods to Liberty.

182. Among other things, NAWI and/or Shandong have not ensured that all rights against carriers, bailees or other third parties have been properly preserved and exercised.

183. NAWI's and/or Shandong's failures have materially increased the scope and extent of the damage allegedly sustained and/or the claimed handling and storage charges, and/or other damages, expenses, costs and losses.

184. NAWI's and/or Shandong's breach of their duty under Clause 16 entitles Liberty to a setoff in respect of the losses suffered by Liberty because of NAWI's and/or Shandong's breach.

185. In addition or in the alternative to the foregoing, all or some of the damages, expenses, costs and losses that Shandong alleges are payable as sue and labor expenses were not

incurred primarily for the benefit of Liberty and/or were not reasonably incurred. They are, therefore, not payable under Clause 16 or otherwise recoverable from Liberty.

## TWENTIETH DEFENSE/AFFIRMATIVE DEFENSE

186.    NAWI and/or Shandong have failed to mitigate their damages, including, but not limited, any damages allegedly caused by Liberty's alleged failure to pay the claim within a reasonable time.

187.    Among other things, NAWI and/or Shandong failed to obtain the prompt release of the shipments from the Port of Houston and thereby exposed the steel to the elements, including multiple rain showers, causing, contributing to or aggravating the damage complained of.

188.    Among other things, NAWI and/or Shandong kept the shipments at the Port of Houston for an unreasonable period of time and thereby exposed the shipments to the elements, including multiple rain showers, causing, contributing to or aggravating the damage complained of and/or unreasonably incurring certain charges, expenses and costs to handle and store the shipments at the port.

189.    Among other things, NAWI and/or Shandong have refused to accept undamaged goods and/or goods that could be used for their intended purpose.

190.    Among other things, NAWI and/or Shandong have failed to take any steps to remediate the alleged damage.

191.    Among other things, NAWI and/or Shandong have failed to reduce the loss by means of a salvage sale.

## TWENTY-FIRST DEFENSE/AFFIRMATIVE DEFENSE

192.    Each of the twelve Certificates covers a single shipment, and each of the twelve shipments is separately insured.

193.    NAWI sought to declare a total loss based on its contention that "82% of the insured steel is substantially damaged." In so doing, NAWI incorrectly based its declaration on the twelve shipments taken as a whole.

194.    If Shandong can make a prima facie showing that the loss alleged in the Amended Complaint falls within the insuring terms of the Marine Insurance Policy and/or the Certificates and coverage for such loss is not excluded or excepted thereunder, each shipment must be considered separately in determining whether there is a constructive total loss.

195.    In addition or in the alternative to the foregoing, in the event it is determined that 82% of the twelve shipments was damaged, which is denied, then this would not constitute a total loss as alleged in the Amended Complaint.

**TWENTY-SECOND DEFENSE/AFFIRMATIVE DEFENSE**

196.    The twelve shipments that are the subject of this action were carried on one vessel from Malaysia to Texas.

197.    Section 1 of the Marine Insurance Policy states, in relevant part:

Section 1 : Cargo
--------------------
Limit of Liability
--------------------

RM 20,000,000.00 – Any one vessel / connecting conveyance / location

198.    The Certificates state, in relevant part: "Policy deductible: 0.5% of Sum Insured to Minimum RM 500 for Each and Every Loss or Whichever Is Higher."

199.    The Marine Insurance Policy includes a provision that states:

**Loss Settlement Clause**
Exchange rate to be applied for loss settlement shall follow the exchange rate applicable on the certificate issued.

200.    The Certificates state, in relevant part: "Exchange Rate : 4.47500000."

33

201.    If Shandong can make a prima facie showing that the loss alleged in the Amended Complaint falls within the insuring terms of the Marine Insurance Policy and/or the Certificates and coverage for the alleged loss is not excluded or excepted thereunder, the total limit of liability under the Marine Insurance Policy and the Certificates is RM 20,000,000.00 (or USD 4,469,273.74) for all twelve shipments and each shipment is subject to a deductible of 0.5% of the sum insured.

### TWENTY-THIRD DEFENSE/AFFIRMATIVE DEFENSE

202.    The "Basis for Valuation" under the Marine Insurance Policy is "invoice value or plus 10%."

203.    If Shandong can make a prima facie showing that the loss alleged in the Amended Complaint falls within the insuring terms of the Marine Insurance Policy and/or the Certificates and coverage for the alleged loss is not excluded or excepted thereunder, not all of the damages, expenses, costs and losses claimed by Shandong are covered under the Marine Insurance Policy and/or the Certificates.

### TWENTY-FOURTH DEFENSE/AFFIRMATIVE DEFENSE

204.    NAWI and/or Shandong were obligated, among other things, to separate the damaged portion of the insured goods from the sound portion of such goods. NAWI and/or Shandong failed to do so. This hindered, delayed and otherwise impeded Liberty's investigation and handling of the claim.

### RESERVATION OF DEFENSES

Liberty reserves the right to assert additional defenses and affirmative defenses as they become known through discovery or further investigation.

**WHEREFORE**, Defendant Liberty General Insurance Berhad prays that judgment be entered in its favor and against Plaintiff Shandong Hi-Speed Building Materials Co., Ltd., as assignee of North American Wood, Inc. (d/b/a North American Metals LLC), dismissing the Amended Complaint and awarding its costs and granting such other and further relief as the Court deems just and proper.

## II. FIRST AMENDED COUNTERCLAIM

Counterclaim-Plaintiff Liberty General Insurance Berhad, by and through its undersigned counsel, as and for its Counterclaim against Counterclaim-Defendant Shandong Hi-Speed Building Materials Co., Ltd., as assignee of North American Wood, Inc. (d/b/a North American Metals LLC) ("Shandong"), and Counterclaim-Defendant North America Wood Inc. (d/b/a North America Metals, Inc.) ("NAWI"), a Wyoming corporation and original Plaintiff, alleges, upon knowledge as to its own acts and upon information and belief as to all other matters, as follows:

### JURISDICTION

1.      The following issues concern breach of a maritime contract and thereby come within the jurisdiction of this Court pursuant to 28 U.S.C. § 1333 and are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2.      Counterclaim-Plaintiff Liberty General Insurance Berhad asserts this Counterclaim against Shandong and NAWI pursuant to Rules 13 of the Federal Rules of Civil Procedure without intending to waive any defenses or objections Liberty may have as to personal jurisdiction or venue, without prejudice to and in the alternative to Liberty's defenses, and to the extent any loss alleged in the Amended Complaint is recoverable.

35

## FACTUAL BACKGROUND

### The Marine Insurance Policy

3.      Liberty is a Malaysian insurance company that provides, among other types of insurance, marine cargo insurance.

4.      Liberty is the underwriter of Marine Open Cover No. B2CC0000157 (the "Marine Insurance Policy" or "Policy"), which is a policy of marine cargo insurance issued to certain non-party insurance intermediaries "insuring the cargo on behalf of cargo owner with the consent from the cargo owner to insured F. T. R. R. & I. [For Their Respective Rights and Interests]."

5.      The period of the Marine Insurance Policy is continuous until cancelled with coverage first attaching from July 7, 2020.

6.      The Marine Insurance Policy provides insurance for insured goods while the goods are in transit, subject to the terms and conditions of the Policy.

7.      The Institute Cargo Clauses (A) 1/1/09 ("ICC(A) Clauses") are one of the terms and conditions of the Marine Insurance Policy for shipments by sea.

8.      Clause 16 of the ICC(A) Clauses states:

**MINIMISING LOSSES**
Duty of Assured

16.      It is the duty of the Assured and their employees and agents in respect of loss recoverable hereunder

16.1    to take such measures as may be reasonable for the purpose of averting or minimising such loss, and
16.2    to ensure that all rights against carriers, bailees or other third parties are properly preserved and exercised

the Insurers will, in addition to any loss recoverable hereunder, reimburse the Assured for any charges properly and reasonably incurred in pursuance of these duties.

36

9.  The purpose of Clause 16 is to benefit the insurer by reducing the amount of loss it would have to pay.

10.  Clause 19 of the ICC(A) Clauses states that the "Insurance is subject to English law and practice."

11.  A certificate of marine cargo insurance is a document that certifies that a specific shipment is covered under a broader, ongoing insurance policy. The certificate details, among other things, the name of the insured, the specific goods covered, the voyage, the sum insured and the coverage terms for the particular transit.

12.  Certificate of Marine Cargo Insurance Nos. B2ME-080587, B2ME-080589, B2ME-080591, B2ME-080670, B2ME-080671, B2ME-080672, B2ME-080673, B2ME-080675, B2ME-080677, B2ME-080678, B2ME-080707 and B2ME-080708 (the "Certificates") were issued under the Marine Insurance Policy.

13.  Each of the Certificates states:

This certifies that LIBERTY GENERAL INSURANCE BERHAD has insured the goods described for the voyage(s) and sum insured as stated herein. It is understood and agreed that this Certificate is issued subject to Liberty General Insurance Berhad's usual Marine Cargo Policy form and relevant clauses attached thereto.

14.  Each of the Certificates identifies "North America Wood Inc." as "The Assured."

15.  Each of the Certificates identifies the conveyance as "By Sea" and the voyage as "From Port Klang to Houston."

16.  Among other Conditions of Cover, each of the Certificates identifies the Institute Cargo Clause (A) - 1/1/09.

37

17.     Each of the Certificates states: "Subject to the terms and conditions as stipulated in Marine Open Cover No. B2CC0000157."

18.     Each of the Certificates states that the "Insurance is subject to English law."

**The Claim**

19.     NAWI sent an email to Liberty care of W.E. Cox Claims Group (USA) LLC on April 29, 2025 with the twelve Certificates attached "filing a claim" under the Marine Insurance Policy "for some physical damage and salt water damage on" "6000 MT steel angle ... MV CHIPOLBROK SUN V.106." The notice of loss stated, among other things, that "[t]he damage is primarily from one hold in the vessel" and that NAWI "will be able to demonstrate the differences in condition from hold to hold." Notwithstanding these statements, NAWI ultimately claimed that all of the steel in every hold was a total loss.

20.     W.E. Cox Claims Group PTE LTD ("W.E. Cox Singapore") is Liberty's claims settling agent for the claim.

21.     W.E. Cox Singapore responded to NAWI's notice of loss in an email on April 30, 2025 asking clarifying questions about the extent of the claimed damage, asking for an estimate of the loss, asking NAWI to issue a Notice of Loss to the carrier and all other parties involved in the transit holding them responsible for the loss, requesting shipping documents, and advising that W.E. Cox Singapore would liaise with NAWI's surveyor directly.

22.     NAWI sent several emails to W.E. Cox Singapore later on April 30, 2025 attaching photographs of the cargoes and a Notice of Protest, the latter of which was addressed to W.E. Cox Singapore.

23.     W.E. Cox Singapore responded to NAWI in an email on May 2, 2025 to advise that the Notice of Protest should be addressed to the carrier and all other parties involved in the transit,

not to W.E. Cox Singapore. W.E. Cox Singapore again asked NAWI to clarify whether the damaged cargo was from all twelve shipments insured under the Certificates and to provide an estimate of the loss. W.E. Cox Singapore also asked NAWI where the cargoes were located so that Liberty's surveyor could arrange a survey.

24. NAWI replied to W.E. Cox Singapore in an email on May 4, 2025 providing, among other things, shipping documents and the location of the cargoes. NAWI also advised that "[i]t is affected all shipments under this 12 certificates."

25. W.E. Cox Singapore again asked NAWI in an email on May 9, 2025 for a "rough estimate of the loss," even if just a percentage of the cargoes.

26. On May 11, 2025, NAWI sent an email to W.E. Cox Singapore valuing the claim at $2.55 million. It stated, among other things, that "[a]pproximately 85-90% of the cargo has been damaged due to rust to some degree." NAWI closed its email by noting that "[t]he cargo is not getting any better and we'd like to avoid excess storage charges."

27. W.E. Cox Singapore, among other things, assigned a surveyor to inspect the cargoes at Houston and to investigate the claim on behalf of Liberty.

28. On May 13, 2025, W.E. Cox Singapore sent an email to NAWI acknowledging NAWI's estimate that approximately 85-90% of the cargoes had been damaged and advised NAWI that Liberty's surveyor would contact NAWI to arrange a survey.

29. Liberty's surveyor inspected the cargoes at the port on May 16, 2025.

30. On May 19, 2025, W.E. Cox Singapore sent an email to NAWI noting, among other things, "[w]e trust our surveyor has already contacted you on this matter."

31.    Later on May 19, 2025, NAWI sent the final survey report of its surveyor to W.E. Cox Singapore, noting that the "independent survey substantiated 82% of the damage" and requesting payment of the claim.

32.    On May 22, 2025, NAWI sent an email to W.E. Cox Singapore to note that NAWI had not been contacted by Liberty's surveyor and to demand payment of the claim "based on the independent report from [NAWI's surveyor]" or, alternatively, payment of 110% of the cargoes' value with Liberty retaining the steel. NAWI stated: "Condition of the steel continues to get worse. The storage and interest expenses are compounding daily."

33.    Later on May 22, 2025, NAWI sent another email to W.E. Cox Singapore advising that customs duty on the cargoes was due the next week.

34.    W.E. Cox Singapore replied to NAWI in an email on May 23, 2025 to note that it was working to obtain the findings of Liberty's surveyor in order to move forward with the claim. In the same message, W.E. Cox Singapore highlighted the insured's duty under Clause 16 of the ICC(A) Clauses to minimize the loss by quoting the clause in full and advised NAWI to act as a prudent uninsured.

35.    On or about May 27, 2025, NAWI and Liberty's surveyor communicated by phone and email concerning the claim.

36.    NAWI sent an email to W.E. Cox Singapore on May 30, 2025 again demanding payment of the claim. NAWI contended that Liberty had two options:

A) Retain the cargo and pay NAWI 110% of the cargoes CFLO value.
Or
B) Pay the claim value as filed, and promptly.
(Claim value to change after June 4,2025).

* * *

40

> NOTE: Due to the delay of honoring the claim, we are re-evaluating our settlement offer. If you cannot confirm payment by June 4, 2025 (12:00 AM-Singapore Time), we will be providing a revised claim value.

NAWI went on to note that "[t]he cargo is deteriorating as it sits in storage creating even further damage."

37.     W.E. Cox Singapore sent an email to NAWI on June 2, 2025 to advise that it was not in a position to reply to NAWI's settlement offer and to remind NAWI of its duty under the Marine Insurance Policy by again quoting Clause 16 of the ICC(A) Clauses. W.E. Cox Singapore again advised NAWI to act as a prudent uninsured.

38.     On June 5, 2025, NAWI sent an email to W.E. Cox Singapore stating that "the condition of the material is deteriorating" and "increasing the claim value due to the current deteriorating condition ..." to $3.05 million. NAWI asked W.E. Cox Singapore to "confirm that [NAWI] are insured for the on going storage charges (due to insurance company delay)and port charges to move the cargo into protected/indoor storage." Notwithstanding that its own surveyor reported that only 82% of the cargoes were affected by rust, NAWI again estimated that "[a]pproximately 85-90% of the cargo has been damaged due to rust to some degree."

39.     W.E. Cox Singapore replied to NAWI in an email later on June 5, 2025, stating that "investigations are still ongoing on this matter and therefore we are not in a position to commit or comment on your proposed offer." W.E. Cox Singapore again reminded NAWI of its "duty under the insurance policy to take measures to minimise the loss and to act as a prudent uninsured." W.E. Cox Singapore suggested that NAWI "may wish to clear and take delivery of the undamaged cargo, to avoid further escalating charges." W.E. Cox Singapore also advised NAWI that W.E. Cox Singapore was, on a without prejudice basis, arranging for a salvage sale in which NAWI would be invited to participate.

41

40.     NAWI acknowledged the potential salvage sale in an email to W.E. Cox Singapore on June 7, 2025 and asked when the sale would take place, while also seeking to impose restrictions on any such sale. In the same message, NAWI reported that U.S. Customs and Border Protection had advised NAWI that the cargoes needed to be moved to a bonded warehouse.

41.     W.E. Cox Singapore sent an email to NAWI on June 9, 2025 to ask about the circumstances of the claimed damage and the condition of the steel at origin. It also asked NAWI for the basis of the restrictions NAWI was seeking to impose on any salvage sale.

42.     NAWI responded in an email later on June 9, 2025 but refused to answer W.E. Cox Singapore's questions until W.E. Cox Singapore first answered NAWI's question about the timing of the salvage sale.

43.     On June 10, 2025, W.E. Cox Singapore sent an email to NAWI to ask for contact details for the load port stevedores, copies of the original bills of lading with reverse sides and certain load port documents, and additional details of the nature of the damage. W.E. Cox Singapore again noted that NAWI had a duty to take all reasonable measures to minimize the loss and to act as a prudent uninsured, suggesting that "[a]n official, open and transparent salvage sale would seem to be the best option to minimise the loss."

44.     Instead of responding to its requests, NAWI sent an email to W.E. Cox Singapore on June 12, 2025 questioning the need for the requested documents and information, while claiming that W.E. Cox Singapore was already in contact with the load port stevedores.

45.     W.E. Cox Singapore explained to NAWI in an email on June 13, 2025 that the bills of lading previously provided by NAWI were unsigned, drafts and that W.E. Cox Singapore had not been in contact with the load port stevedores.

46.     NAWI responded to W.E. Cox Singapore in an email on June 13, 2025. Among other things, NAWI stated that the identity of the load port stevedore "will not be supplied to Cox, insurance company or the vessel owner."

47.     Liberty's surveyor participated in a joint survey of the cargoes with NAWI's surveyor on June 20, 2025.

48.     On June 23, 2025, NAWI sent an email to W.E. Cox Singapore threatening to file suit if Liberty did not confirm within two days that the claim would be paid as presented.

49.     W.E. Cox Singapore responded to NAWI in an email later on June 23, 2025, stating in part:

> As you will appreciate, for a claim of this magnitude the circumstances have to be investigated very thoroughly, both in terms of causation and quantum. You will be aware from your own surveyor's attendance at the joint survey last week, these investigations are still ongoing.
>
> In our capacity as the claims agent on behalf of your insurers I can advise you that they will only be in a position to consider this claim once these investigations are complete. As part of these investigations, my colleague has raised a number of requests with you, which I note are still unanswered, and this is delaying the investigations. I therefore repeat them below for your easy reference and would urge you to respond as soon as possible ....

W.E. Cox Singapore reminded NAWI of its duty to act as a prudent uninsured by taking all reasonable measures to minimize the loss and to ensure that all rights of recovery against third parties are properly protected. It also repeated its request for the contact details of the load port stevedores.

50.     On June 24, 2025, W.E. Cox Singapore sent an email to NAWI repeating its request for the reverse side of the bills of lading so that W.E. Cox Singapore could "determine the law and jurisdiction applicable under the contract of carriage and whether the bills of lading incorporate a Clause Paramount."

51.     NAWI finally provided the signed bills of lading, including the reverse side, on June 24, 2025.

52.     On June 28, 2025, NAWI sent an email to W.E. Cox Singapore repeating its threat to file suit if Liberty did not confirm that the claim would be paid as presented.

53.     W.E. Cox Singapore responded to this threat in an email later on June 28, 2025, noting that NAWI's lack of cooperation was hindering investigation of the claim. W.E. Cox Singapore stated, in part:

> But I would suggest that any such action is, at best, premature and is not conducive to us working to seek a resolution to this claim. Insurers have not denied liability, but they will expect to see a thorough investigation to enable them to give it their due consideration.
>
> These investigations basically cover two aspect - causation and quantum.
>
> Insofar as causation is concerned, there has been reference to the presence of graphite dust and that one of the vessel's holds were flooded. These are being investigated but, apart from these points, we are also required to carry out investigations at the load port. Not least, the outcome of these investigations will be required for the pursuance of the claim against the carriers. In this regard, we have on more than one occasion requested that we be provided with load port documents and also the contact details of the stevedores who attended the loading. These investigations are hampered as a result of your client's failure to respond to our requests.
>
> Turning to the quantum aspect of the claim, there is a duty under both the insurance contract and the contract of carriage to take every reasonable effort to minimise the loss. One of the best and most transparent ways to do this is to carry out a formal salvage sale. We are currently awaiting the outcome of the joint survey, which was carried out just over a week ago. Once this is received we will revert with further details regarding the proposed sale. * * *
>
> We will revert with further details regarding the salvage sale as soon as possible and, in the meantime, I again ask that we be provided with the load port documents and details, as previously requested.

54.     With the survey report in hand following the recent joint survey, W.E. Cox Singapore wrote to NAWI on July 9, 2025 to note that "it is quite apparent that a very significant

proportion of the bundles have not suffered any significant damage at all" or, "[a]t worst, these bundles have suffered relatively minor surface atmospheric rusting and there is no reason why they should not be cleared and treated as sound." W.E. Cox Singapore also noted that "[n]ormal atmospheric rusting would not be considered to be due to an insured peril." It again remined NAWI of its "duty to take all reasonable measures to minimise the loss and to act as a prudent uninsured." Under the circumstances, W.E. Cox Singapore urged NAWI "to make arrangements to clear the shipments as soon as possible." As for any bundles that could not be used as intended, W.E. Cox Singapore stated that such bundles should be segregated for further consideration.

55.    NAWI countered in an email on July 15, 2025 that its surveyor's report "indicated salt water damage in several holds" and that "the joint survey shows salt water and chemical contamination." However, NAWI pointed to only four out of the twelve bills of lading to support the claimed damage. NAWI ended its email by stating that it "would rather make a settlement and move the cargo to prevent further damage."

56.    W.E. Cox Singapore responded to NAWI on July 16, 2025 by forwarding its email of July 9, 2025 and reminding NAWI of its duty to minimize the loss, stating:

> As we have previously mentioned your client has a duty to take all reasonable measures to minimise the loss and to act as a prudent uninsured and therefore, we would urge them to make arrangements to clear the shipments as soon as possible. After clearing the shipments, any more seriously damaged bundles which may have been in contact with seawater and which cannot be used as intended can be segregated and a discussion can then be held as to the options available to minimise the loss on those bundles.

57.    NAWI rejected W.E. Cox Singapore's comments in an email on July 24, 2025 and stated, in part: "Following months of outdoor warehouse storage with significant rainwater exposure, a joint survey with your appointed surveyor not only reconfirmed definitive evidence of marine damage but also detected chemical contamination in several holds."

58.    W.E. Cox Singapore responded in an email on July 25, 2025 repeating its prior points, including that "a significant proportion of the bundles have not suffered any significant damage at all and at worst, these bundles have suffered relatively minor surface atmospheric rusting and there is no reason why these should not be cleared and treated as sound." W.E. Cox Singapore again requested the load port documents and contact details for the load port stevedores. It also reminded NAWI of its "duty to take all reasonable measures to minimise the loss and to act as a prudent uninsured," again urging NAWI "to make arrangements to clear the shipments as soon as possible."

59.    Instead of providing the requested information, NAWI sent W.E. Cox Singapore contact details for the vessel owner, the discharge port stevedores and its surveyor on August 6, 2025.

60.    W.E. Cox Singapore made note of this in an email to NAWI later on August 6, 2025 and again requested contact details for the load port stevedores. It also asked NAWI's intentions "with regard to sorting and segregation of the cargo."

61.    Following an intermediate exchange, NAWI provided W.E. Cox Singapore with contact details for its freight forwarder that handled the cargoes in Malaysia later on August 6, 2025.

62.    W.E. Cox Singapore reached out to the freight forwarder on August 7, 2025 and followed up on August 12, 2025. The freight forwarder never responded.

63.    NAWI advised W.E. Cox Singapore on August 21, 2025 that the "steel are all mix together" and that "[t]here is no way to sore [sic] it out good and bad." NAWI preposterously asserted that it would have "to build a warehouse and buy the equipments and hire hundreds of people ..." to sort the cargoes. NAWI asked if Liberty was "willing to pay the claim or not."

46

64. NAWI sent a second email to W.E. Cox Singapore on August 21, 2025 stating, among other things, that it was not "wasting the money nor spending the time sorting the steel." NAWI acknowledged that W.E. Cox Singapore continually reminded NAWI that it "must protect the steel" and admitted that the steel was "further contaminated ... due to rain and additional warehouse condensation" while the claim was under investigation.

65. W.E. Cox Singapore sent an email to NAWI on August 25, 2025 explaining why sorting of the cargoes was needed:

> ... the majority of bundles show less serious slight atmospheric rusting, and there is no reason why these bundles cannot be used as intended. It is entirely inappropriate for insurers to consider the claim as it presently stands, which is why we have suggested that a sorting operation be carried out. All this would entail is for you taking delivery of the bundles which are undamaged or which show atmospheric rusting only and putting to one side the more seriously seawater-damaged bundles so that an assessment can be carried out to determine the options available to minimise the loss of those bundles.

66. NAWI suggested in an email to W.E. Cox Singapore several days later that Liberty should "keep the steel and pay the claim."

67. W.E. Cox Singapore responded on August 28, 2025 that it was "not the role of the insurer to step in the shoes of the cargo owner and take on this task [i.e., sorting]." It advised NAWI that "[i]t remains the responsibility of the cargo owner/insured to minimise the loss and to prove their loss." W.E. Cox Singapore noted that "[t]he reasonable cost of sorting can be included in [the] claim with the insurers and will be considered accordingly," offering for Liberty's surveyor "to discuss the necessary arrangements with [NAWI's] appointed surveyor."

68. W.E. Cox Singapore received a letter from attorneys representing NAWI on September 16, 2025 demanding payment of the claim.

69. W.E. Cox Singapore responded to the attorneys on September 17, 2025 and noted the points it repeatedly raised with NAWI over the prior several months concerning the

47

investigation of the claim, including the need to sort the cargoes, taking delivery of undamaged steel, the numerous requests for load port documents and the repeated requests for details of the parties responsible for the loading of the cargoes. W.E. Cox Singapore reported that the investigation was "still not complete because [of] ... lack of co-operation from [NAWI]." It advised that Liberty did "not accept the extent of damage is as claimed" and questioned why bundles that showed normal atmospheric rusting could not be collected and dealt with as normal. Finally, W.E. Cox Singapore stated that NAWI "cannot simply abandon the cargo and expect insurers to settle on a total loss basis or even with an unsubstantiated discount."

70.    W.E. Cox Singapore and NAWI's attorneys had one more exchange along similar lines with no resolution of the issues raised by W.E. Cox Singapore.

71.    To this day, Liberty does not know whether the cargoes have been cleared by Customs and removed from the port. The allegations in the Amended Complaint imply that they have not.

72.    Attorneys for Counterclaim-Defendant Shandong Hi-Speed Building Materials Co., Ltd. advised Liberty and W.E. Cox Singapore by email on February 12, 2026 that NAWI had purportedly assigned and transferred all rights, title and interest in the claims at issue, including any claims against Liberty, to Shandong on November 7, 2025.

73.    Despite its assignment, NAWI filed this action against Liberty on December 22, 2025 seeking to recover in full for the alleged loss of and damage to the twelve shipments of steel carried on the M/V CHIPOLBROK SUN.

74.    W.E. Cox Singapore sent a message to NAWI on April 15, 2026 to remind NAWI of Clause 16 of the ICC(A) Clauses and to advise that claims against the carriers, bailees or other third parties (including, but not limited to, vessel owners under any charter party and the

48

CHIPOLBROK SUN) may be subject to a one-year time bar that was to expire on April 22, 2026. W.E. Cox Singapore suggested that NAWI should take all reasonable and necessary steps to properly preserve all rights and claims against the carriers, bailees and other third parties arising out of the subject losses keeping in mind the impending one-year anniversary of discharge at Houston.

75.     Liberty does not know whether NAWI did so.

76.     Liberty's counsel sent a message to Shandong's original attorneys on April 15, 2026 to make Shandong aware of Clause 16 of the ICC(A) Clauses and to advise that claims against the carriers, bailees or other third parties (including, but not limited to, vessel owners under any charter party and the CHIPOLBROK SUN) may be subject to a one-year time bar that was to expire on April 22, 2026. Liberty's counsel suggested that Shandong should take all reasonable and necessary steps to properly preserve all rights and claims against the carriers, bailees and other third parties arising out of the subject losses keeping in mind the impending one-year anniversary of discharge at Houston.

77.     Liberty does not know whether Shandong did so.

78.     All obligations under the Marine Insurance Policy to be performed on the part of Liberty were performed, waived or otherwise excused.

### AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract)

79.     Liberty repeats and realleges each and every allegation set forth in Paragraphs 1 through 78 of this Counterclaim with the same force and effect as if more fully set forth herein.

80.     NAWI, by its own statements, knew no later than May 11, 2025 that the steel was deteriorating while sitting in storage at the port and that storage charges continued to accrue. Over the next several months, NAWI repeatedly noted the deteriorating condition of the steel and the

49

increasing storage charges. Despite this knowledge and continual reminders by W.E. Cox Singapore, NAWI took no steps to protect the steel, to obtain the release of the cargoes or to minimize the loss.

81.     Shandong has similarly taken no steps to protect the steel, to obtain the release of the cargoes or to minimize the loss.

82.     Liberty disputes that the loss alleged in the Amended Complaint is recoverable under the Marine Insurance Policy and/or the Certificates.

83.     The purported terms of the alleged assignment by NAWI to Shandong do not release NAWI from its obligations under the Policy, including compliance with Clause 16 of the ICC(A) Clauses.

84.     If Shandong can establish a prima facie case showing that the loss alleged in the Amended Complaint falls within the insuring terms of the Marine Insurance Policy and/or the Certificates and coverage for such loss is not excluded or excepted thereunder, Liberty is entitled to rely on Section 50(2) of the Marine Insurance Act 1906. This entitles Liberty to rely on the same defenses against Shandong as would have been available against NAWI. These include, *inter alia*, a right of equitable set off in connection with NAWI and/or Shandong's breach of their duty under Clause 16 by failing to take reasonable measures to avert or minimize the loss and/or by failing to ensure that all rights against carriers, bailees or other third parties have been properly preserved and exercised.

85.     Among other things, NAWI and/or Shandong have failed to act as a prudent uninsured.

50

86.    Among other things, NAWI and/or Shandong failed to obtain the prompt release of the shipments from the Port of Houston and thereby exposed the steel to the elements, including multiple rain showers, causing, contributing to or aggravating the damage complained of.

87.    Among other things, NAWI and/or Shandong kept the shipments at the Port of Houston for an unreasonable period of time and thereby exposed the steel to the elements, including multiple rain showers, causing, contributing to or aggravating the damage complained of.

88.    Among other things, NAWI and/or Shandong have failed to separate the damaged portion of the insured goods from the sound portion of such goods.

89.    Among other things, NAWI and/or Shandong have refused to accept undamaged goods and/or goods that could be used for their intended purpose.

90.    Among other things, NAWI and/or Shandong have failed to take any steps to remediate the alleged damage.

91.    Among other things, NAWI and/or Shandong have failed to reduce the loss by means of a salvage sale.

92.    Among other things, NAWI improperly sought to declare a constructive total loss and to abandon the goods to Liberty.

93.    Among other things, NAWI and/or Shandong have not ensured that all rights against carriers, bailees or other third parties have been properly preserved and exercised.

94.    NAWI's and/or Shandong's failures have materially increased the scope and extent of the damage allegedly sustained and/or the claimed handling and storage charges, and/or other damages, expenses, costs and losses.

95.     NAWI's breach of its duty under Clause 16 entitles Liberty to damages and/or a right of set off in respect of the losses suffered by Liberty because of NAWI's breach.

96.     Shandong's breach of its duty under Clause 16 entitles Liberty to damages and/or a right of set off in respect of the losses suffered by Liberty because of Shandong's breach.

**WHEREFORE**, Counterclaim-Plaintiff Liberty General Insurance Berhad demands judgment against Counterclaim-Defendant Shandong Hi-Speed Building Materials Co., Ltd., as assignee of North American Wood, Inc. (d/b/a North American Metals LLC), and Counterclaim-Defendant North America Wood Inc. (d/b/a North America Metals, Inc.), as follows:

A.     For judgment on the First Cause of Action in favor of Counterclaim-Plaintiff and against Counterclaim-Defendants awarding Counterclaim-Plaintiff damages or set off in an amount to be determined at trial; and

B.     For such other and further relief as the Court deems just and proper under the circumstances, together with the costs and disbursements of this action.

Respectfully submitted,

/s/ David S. Toy
David S. Toy
SBN 24048029 / SDTX ID 588699
DAVID TOY LAW FIRM
4309 Yoakum Boulevard, Suite 2050
Houston, TX 77002
david.toy@davidtoylaw.com
(T) 713-322-7911

- and -

52

Kevin J.B. O'Malley
SBN NY3039104 / SDTX ID 3848655
NICOLETTI HORNIG NAMAZI ECKERT & SHEEHAN
Wall Street Plaza
88 Pine Street, Seventh Floor
New York, New York 10005-1801
Tel: (212) 220-3830
Fax: (212) 220-3780
komalley@nicolettihornig.com

*Attorneys for Defendant / Counterclaim Plaintiff*
*Liberty General Insurance Berhad*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon counsel of record via the Court's CM/ECF system at the time of filing hereof on this 10th day of June, 2026.


*/s/ David S. Toy*
David S. Toy